No. 26-3131

# In the United States Court of Appeals for the Ninth Circuit

PEPPERDINE UNIVERSITY,
*Plaintiff-Appellant*,

v.

NETFLIX, INC., WARNER BROS. ENTERTAINMENT, INC., AND KALING INTERNATIONAL INC.,
*Defendants-Appellees*.

Appeal from the United States District Court for the Central District of California
(Hon. Cynthia Valenzuela, No. 2:25-cv-1429-CV-ADS)

## PEPPERDINE UNIVERSITY'S OPENING BRIEF

ANDREI IANCU
ROBERT A. SACKS
AMY E. PROCTOR
CALEB J. DOWNS
EMILY D. OLSEN
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telephone: (310) 712-6600

AVIV S. HALPERN
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: (650) 461-5600

DANIEL J. RICHARDSON
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 956-7500

DANIEL M. CISLO
KATHERINE M. BOND
CISLO & THOMAS LLP
12100 Wilshire Blvd., Ste. 1700
Los Angeles, California 90025
Telephone: (310) 979-9190

*Attorneys for Pepperdine University*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Pepperdine University by and through its undersigned counsel, hereby certifies that it does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated: October 2, 2026

*/s/ Andrei Iancu*
Andrei Iancu

## TABLE OF CONTENTS

*Page*

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 7

ISSUES PRESENTED .......... 7

STATEMENT OF THE CASE .......... 8

A. Legal Background .......... 8

B. Factual Background .......... 12

1. Pepperdine's trademarks .......... 12

2. Defendants' infringement .......... 14

C. Procedural Background .......... 21

1. Pepperdine's motion for a temporary restraining order .......... 21

2. Defendants' motion to dismiss .......... 23

SUMMARY OF THE ARGUMENT .......... 26

STANDARD OF REVIEW .......... 30

ARGUMENT .......... 31

I. *Rogers* Does Not Apply To Pepperdine's Allegations .......... 32

A. Pepperdine Sufficiently Alleged That Defendants Used the Waves Marks as a Trademark to Identify and Distinguish *Running Point* .......... 33

B. The District Court's Decision to Nonetheless Apply the *Rogers* Test Was Legally Erroneous .......... 46

II. Even If *Rogers* Applies, Pepperdine's Allegations Satisfy It .......... 57

A. Pepperdine's Allegations Satisfy the *Rogers* Test ........................ 57

B. The District Court Misapplied the *Rogers* Test ........................ 63

III. Alternatively, This Court Should Revisit *Rogers* ........................ 68

CONCLUSION ........................ 70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AMF Inc.* v. *Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) .......... 2, 3, 69

*B&B Hardware Inc.* v. *Hargis Indus., Inc.*,
575 U.S. 138 (2015) .......... 33

*Barnes* v. *Scola*,
2026 WL 2059087 (N.D. Cal. July 16, 2026) .......... 43, 56

*Belin* v. *Starz Ent., LLC*,
2024 WL 4720795 (C.D. Cal. Sept. 20, 2024) .......... *passim*

*Brown* v. *Elec. Arts, Inc.*,
724 F.3d 1235 (9th Cir. 2013) .......... 58, 62

*Davis* v. *Blue Tongue Films*,
2024 WL 5182630 (9th Cir. Dec. 20, 2024) .......... 37, 43

*Dickinson* v. *Ryan Seacrest Enters., Inc.*,
839 F. Appx. 110 (9th Cir. 2020) .......... 58

*Diece-Lisa Indus., Inc.* v. *Disney Enters., Inc.*,
2024 WL 5413113 (C.D. Cal. May 1, 2024) .......... 43

*Down to Earth Organics, LLC* v. *Efron*,
2024 WL 1376532 (S.D.N.Y. Mar. 31, 2024) .......... 45

*Dr. Seuss Enters., L.P.* v. *ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) .......... 58, 62, 64

*E.S.S. Ent. 2000, Inc.* v. *Rock Star Videos, Inc.*,
547 F.3d 1095 (9th Cir. 2008) .......... 62

*Gordon* v. *Drape Creative, Inc.*,
909 F.3d 257 (9th Cir. 2018) .......... *passim*

*Haas Automation, Inc.* v. *Steiner*,
750 F. Supp. 3d 1107 (C.D. Cal. 2024) ....................................................... 45

*Hara* v. *Netflix, Inc.*,
146 F.4th 872 (9th Cir. 2025) ....................................................................... 44

*Harley-Davidson, Inc.* v. *Grottanelli*,
164 F.3d 806 (2d Cir. 1999) ......................................................................... 35

*Hart* v. *Massanari*,
266 F.3d 1155 (9th Cir. 2001) ....................................................................... 68

*HomeVestors of Am., Inc.* v. *Warner Bros. Discovery, Inc.*,
2023 WL 6880341 (D. Del. Oct. 18, 2023) ..................................................... 35

*Ironhawk Techs., Inc.* v. *Dropbox, Inc.*,
2 F.4th 1150 (9th Cir. 2021) ................................................................ 9, 54, 70

*Jack Daniel's Properties, Inc.* v. *VIP Products LLC*,
599 U.S. 140 (2023) ................................................................................ *passim*

*JTH Tax LLC* v. *AMC Networks Inc.*,
694 F. Supp. 3d 315 (S.D.N.Y. 2023) ............................................................ 44

*K & K Promotions, Inc.* v. *Walt Disney Studios Motion Pictures*,
2022 WL 3585589 (9th Cir. Aug. 22, 2022) .................................................... 62

*Lee* v. *Fisher*,
70 F.4th 1129 (9th Cir. 2023) ........................................................................ 69

*Levi Strauss & Co.* v. *Blue Bell, Inc.*,
632 F.2d 817 (9th Cir. 1980) ......................................................................... 49

*PLS.com LLC* v. *Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022) ..................................................................... 63, 67

*Louis Vuitton Malletier S.A.* v. *Warner Bros. Ent. Inc.*,
868 F. Supp. 2d 172 (S.D.N.Y. 2012) ............................................................ 44

*Mar Vista Ent.* v. *THQ Nordic AB*,
2024 WL 3468933 (C.D. Cal. July 8, 2024) .................................................... 43

*Mattel, Inc.* v. *MCA Records, Inc.*,
296 F.3d 894 (9th Cir. 2002) .......... 10, 34, 44

*NBCUniversal Media, LLC* v. *Jay Kennette Media Grp. LLC*,
653 F. Supp. 3d 732 (C.D. Cal. 2023) .......... 11, 49, 52

*P&P Imports LLC* v. *Johnson Enters., LLC*,
46 F.4th 953 (9th Cir. 2022) .......... 36

*Punchbowl, Inc.* v. *AJ Press, LLC*,
90 F.4th 1022 (9th Cir. 2024) .......... *passim*

*Rogers* v. *Grimaldi*,
875 F.2d 994 (2d Cir. 1989) .......... *passim*

*The Upper Deck Co.* v. *Pixels.com, LLC*,
2026 WL 776227 (S.D. Cal. Mar. 19, 2026) .......... 43

*Trader Joe's Co.* v. *Trader Joe's United*,
150 F.4th 1040 (9th Cir. 2025) .......... 9, 30

*Twentieth Century Fox Television* v. *Empire Distrib., Inc.*,
875 F.3d 1192 (9th Cir. 2017) .......... 31, 61, 62

*Univ. of Ala. Bd. of Trs.* v. *New Life Art, Inc.*,
683 F.3d 1266 (11th Cir. 2012) .......... 45

*Viacom Int'l* v. *IJR Capital Investments, L.L.C.*,
891 F.3d 178 (5th Cir. 2018) .......... *passim*

*Watts* v. *Amazon Studios, LLC*,
2026 WL 1678287 (S.D.N.Y. June 9, 2026) .......... 45

*Yuga Labs, Inc.* v. *Ripps*,
144 F.4th 1137 (9th Cir. 2025) .......... 37

**Statutes**

15 U.S.C. § 1065 .......... 12

15 U.S.C. § 1114 .......... 3, 9, 21, 33

15 U.S.C. § 1121 .......... 7

15 U.S.C. § 1125 .......... 50

15 U.S.C. § 1127 .......... 8, 36, 42

28 U.S.C. § 1291 .......... 7

28 U.S.C. § 1331 .......... 7

28 U.S.C. § 1338 .......... 7

28 U.S.C. § 1367 .......... 7

TMEP § 1202 .......... 42

## INTRODUCTION

This case implicates a basic principle of trademark law that the district court simply got wrong: the traditional likelihood-of-confusion test applies whenever a defendant has used another's trademark as a trademark—that is, in a way that identifies and distinguishes its own products in the marketplace. Pepperdine University spent nine decades investing in its "Waves" trademarks and building its brand. Defendants then appropriated those trademarks to promote a new television show, *Running Point*, in a way that rendered the "Waves" marks, as the district court recognized, "essentially synonymous" with that show. 1-ER-14-15. But despite the textbook example of trademark infringement alleged in Pepperdine's complaint, the district court invoked a test first announced in *Rogers* v. *Grimaldi*, 875 F.2d 994 (2d Cir. 1989) to deny Pepperdine its day in court. The district court's decision fundamentally misapplies the Supreme Court's decision in *Jack Daniel's Properties, Inc.* v. *VIP Products LLC*, 599 U.S. 140, 146 (2023), which substantially narrowed the circumstances in which the *Rogers* test may apply. And, if not reversed, the district court's approach would give the entertainment industry carte blanche to infringe trademarks at will. This outcome is both wrong and dangerous.

Located in Los Angeles County, Pepperdine's sports teams—including its basketball team—have been named the Waves and used the same orange, blue, and white colors since the school's founding in 1937. Last year, Defendants released *Running Point*, which centers around a Los Angeles basketball team they chose to name the Waves and brand with the same orange and blue color palettes and font styles. The overall presentation between the two uses is so striking that the Waves-branded apparel featured in Defendants' show could easily have been purchased at the Pepperdine student store. Defendants' use of Pepperdine's Waves mark is pervasive within the show and also featured in promotional branding online, across social media, and at in-person events.

Despite these clear factual allegations (which will be supported by ample evidence in discovery), the district court never evaluated the complaint's sufficiency under the traditional likelihood-of-confusion test. *See AMF Inc.* v. *Sleekcraft Boats*, 599 F.2d 341, 348-349 (9th Cir. 1979). Instead, it held that, under the *Rogers* test, expressive works—even ones that use others' trademarks to identify and distinguish the work—are effectively exempt from trademark liability as long as their producers are correctly named in the credits.

That interpretation of *Rogers* is unsupportable and at odds with binding precedent. The Supreme Court's unanimous *Jack Daniel's* decision abrogated prior decisions that applied the *Rogers* test to any and all uses of another's trademark in expressive works, holding instead that the traditional likelihood-of-confusion test applies whenever a defendant has used a plaintiff's trademarks in an expressive work "'*at least in part*' for 'source identification' "—"in other words, has used a trademark as a trademark." 599 U.S. at 145, 156 (emphasis added) (quoting *Tommy Hilfiger Licensing, Inc.* v. *Nature Labs, LLC*, 221 F. Supp. 2d 410, 412 (S.D.N.Y. 2002)). In reaching that result, the Supreme Court made clear that, regardless of whether the *Rogers* test remains appropriate in some cases involving artistic expression, it does not "insulate[] from ordinary trademark scrutiny the use of trademarks as trademarks," even when a defendant's product label otherwise expressly identifies its own maker and disclaims any association with another brand. *Id.* at 156, 160.[1]

1 When *Rogers* does not apply, the "ordinary trademark scrutiny" is the likelihood of confusion analysis for trademark infringement (15 U.S.C. § 1114(1)), which, in this Circuit, follows the multi-factor test laid out in *Sleekcraft*, 599 F.2d at 348-349.

Following that decision, this Court and others have refused to apply *Rogers* in situations where, as here, a defendant used a plaintiff's trademark at least in part to "identify and distinguish" the defendant's product and thereby indicate its source. *See, e.g.*, *Punchbowl, Inc.* v. *AJ Press, LLC*, 90 F.4th 1022, 1031 (9th Cir. 2024) (quoting *Jack Daniel's*, 599 U.S. at 145, 160). As courts have recognized, that principle applies regardless of whether the trademark is being used in a television show or other media. *See Belin* v. *Starz Ent., LLC*, 2024 WL 4720795, at *4-5 (C.D. Cal. Sept. 20, 2024) (*Rogers* inapplicable where plaintiff alleged defendants used mark "to identify the source" of television show).

That precedent should have made Defendants' motion to dismiss an easy one to deny. It was not for the district court to decide at the motion-to-dismiss stage whether Pepperdine would ultimately prove either that the Waves marks indicate the source of *Running Point* or a likelihood of confusion sufficient to prevail on its infringement claims; the only question was whether Pepperdine had adequately alleged those elements. The complaint did precisely that.

By nonetheless applying *Rogers* to Pepperdine's allegations, the district court reasoned that the only way to identify the "source" of a television show

is by looking to the list of its producers, which of course did not include Pepperdine. 1-ER-13. No precedent supports the district court's cramped reading of *Jack Daniel's*. On the contrary, this Court's decisions recognize that, as with ordinary goods, there are many different ways to designate the source of an expressive work. Indeed, the clearest proof that the district court's test is wrong is that it would have dictated a different result in *Jack Daniel's* itself, where the Supreme Court found a use was source-identifying even though the allegedly offending dog toy expressly identified the defendant as its producer and disclaimed any connection to Jack Daniel's, the plaintiff. 599 U.S. at 150. More broadly, application of the district court's approach would effectively insulate movies and television shows from the trademark laws, giving them free rein to steal anyone's trademarks and associated goodwill, as long as the credits list the correct producers. This is nonsensical and would in substance, as amply reflected by the result below, eviscerate all of trademark law for this particular industry.

All told, the complaint's allegations state a classic case of trademark infringement. Defendants branded their fictional team with the Waves marks, splashed those marks in virtually every scene of every episode across the show and in real-world advertising and social media, and emblazoned them on cast

apparel, swag, set pieces, and even the director's chair. Put simply, Defendants used the Waves marks without permission to identify and distinguish their entertainment product—*Running Point*—in the marketplace. In the district court's own words, Defendants' use of the Waves was "essentially synonymous with the show's identity and its source." 1-ER-14-15. Under *Jack Daniel's*, that means that *Rogers* has "no proper role" to play in this case. 599 U.S. at 156. This Court should reverse on that basis alone.

But even assuming *Rogers* applies, it would not shield Defendants from the trademark laws because, as alleged here, Defendants explicitly misled consumers into believing that the plaintiff has endorsed or is affiliated with their work. The district court held otherwise only because it failed to consider the allegations in the light most favorable to Pepperdine, as it was required to do at the motion-to-dismiss stage.

Defendants are not permitted to usurp Pepperdine's valuable intellectual property, which Pepperdine properly trademarked and established through almost a century of consistent use and investment, just because the infringing product is a television show. The complaint more than adequately alleges the elements of trademark infringement, and *Jack Daniel's*

and its progeny demonstrate clearly that the district court's dismissal of the complaint in light of those allegations is unsupportable. The district court's decision granting the motion to dismiss should be reversed.

## JURISDICTIONAL STATEMENT

On April 15, 2026, the district court entered final judgment for Defendants and dismissed the underlying action with prejudice. The district court had subject-matter jurisdiction over Pepperdine's federal claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction over its state-law claims under 28 U.S.C. § 1367(a).

Pepperdine timely appealed on May 11, 2026, pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A). This Court has jurisdiction over this appeal pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court erred in holding that Pepperdine failed to plausibly allege that Defendants used Pepperdine's Waves marks as source-identifying trademarks for *Running Point*.

2. Whether the district court erred in holding that Pepperdine failed to plausibly allege a trademark violation under the *Rogers* test.

3. Whether the *Rogers* test is viable in light of the Lanham Act and the Supreme Court's *Jack Daniel's* decision.

## STATEMENT OF THE CASE

### A. Legal Background

A trademark is "any word, name, symbol, or device, or any combination thereof" that a person uses "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. The "primary" function of a trademark is "to identify the origin or ownership of the article to which it is affixed." *Jack Daniel's Props., Inc.* v. *VIP Prods. LLC*, 599 U.S. 140, 145-146 (2023) (quoting *Hanover Star Milling Co.* v. *Metcalf*, 240 U.S. 403, 412 (1916)). "[W]hatever else it may do, a trademark is not a trademark unless it identifies a product's source (this is a Nike) and distinguishes that source from others (not any other sneaker brand)." *Id.* at 146.

A trademark need not identify a product's source by its corporate name; it is enough if that mark identifies and distinguishes the product as emanating from a consistent source, "even if that source is unknown" to consumers. *See* 15 U.S.C. § 1127. The presence of another source identifier does not change that analysis; the mark need only create a "separate and distinct commercial impression." *Viacom Int'l* v. *IJR Capital Investments, L.L.C.*, 891 F.3d 178, 188 (5th Cir. 2018) ("That the [Krusty Krab] mark typically appears alongside

the 'SpongeBob SquarePants' trademark does not threaten its status as a trademark."); *see also Jack Daniel's*, 599 U.S. at 160 ("On the hangtag, the Bad Spaniels logo sits opposite the concededly trademarked Silly Squeakers logo, with both appearing to serve the same source-identifying function").[2]

Under the Lanham Act, a defendant commits trademark infringement by using a mark in a manner that is likely to confuse consumers as to source. *See* 15 U.S.C. § 1114(1)(a). That inquiry is highly fact-bound, and trademark infringement suits are rarely resolved on a motion to dismiss. *Trader Joe's Co.* v. *Trader Joe's United*, 150 F.4th 1040, 1049 (9th Cir. 2025) (explaining that dismissal at the pleading stage "is generally disfavored") (quoting *Yuga Labs, Inc.* v. *Ripps*, 144 F.4th 1137, 1167 (9th Cir. 2025)).

As relevant here, trademark owners remain entitled to protection when their marks are used in expressive works *at least in part* as an indication of source. *See Punchbowl*, 90 F.4th at 1028-1030. If, however, the mark plays *no* role as an identifier of source, then the *Rogers* test applies and the plaintiff must prove that the defendant's use of the plaintiff's trademark (1) was not

[2] Indeed, this Court has even recognized that the inclusion of a house mark "in a reverse confusion case . . . can also aggravate confusion by reinforcing the association between the mark and the junior user." *Ironhawk Techs., Inc.* v. *Dropbox, Inc.*, 2 F.4th 1150, 1164 (9th Cir. 2021).

artistically relevant to the work or (2) "explicitly misle[d] consumers as to the source or the content of the work." *Rogers*, 875 F.2d at 999. In essence, courts have recognized that purely non-trademark uses—and *only* those uses—implicate "the public's interest in free expression." *See Mattel, Inc.* v. *MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002).

The Supreme Court has never endorsed the *Rogers* test. And its recent (and unanimous) decision in *Jack Daniel's* held that, even if *Rogers* remains good law in some "cabined" circumstances, it does not apply when the defendant has used the mark, at least in part, "to designate the source of its own goods—in other words, has used a trademark as a trademark." 599 U.S. at 142, 145, 163. Accordingly, if a defendant uses the plaintiff's trademark in any way that identifies and distinguishes its own products, the ordinary trademark likelihood-of-confusion test applies and *Rogers* does not; a defendant cannot escape the ordinary rules of trademark infringement solely because the infringing product is an expressive work. *See Punchbowl*, 90 F.4th at 1031 (overruling decisions holding that "the only threshold for applying *Rogers* was an attempt to apply the Lanham Act to something expressive").

Importantly, a defendant's use of its own name alongside the infringing mark reinforces that the infringing mark is being used as a source identifier. In *Jack Daniel's*, for example, the defendant's product was packaged with a cardboard hangtag bearing the defendant's own "Silly Squeakers" logo opposite the allegedly infringing "Bad Spaniels" logo. 599 U.S. at 150. The Supreme Court noted both marks appeared "to serve the same source-identifying function." *Id.* at 160. Indeed, it is common for a single good to have multiple trademarks associated with it. "Nike," the Swoosh and "Just Do It" all serve as trademarks for Nike goods. *See, e.g.*, U.S. Reg. No. 1,945,654; U.S. Reg. No. 1,237,469; U.S. Reg. No. 1,875,307. And in the context of television shows, courts have recognized that the studio, production company, series title, and a fictional mark used pervasively throughout the show can all function as source-identifying trademarks. *See NBCUniversal Media, LLC* v. *Jay Kennette Media Grp. LLC*, 653 F. Supp. 3d 732, 746-747 (C.D. Cal. 2023) (noting plaintiffs possessed common-law rights in "Dunder Mifflin," the fictional workplace featured in the television show, *The Office*); *see also Viacom*, 891 F.3d at 186-187 (concluding that "specific elements from within a television show" may be used as source identifiers where they "create[] a separate and distinct commercial impression").

## B. Factual Background

### 1. Pepperdine's trademarks

Pepperdine University is a well-known institution located in Malibu, California. 2-ER-124, 2-ER-126. Pepperdine owns several registered and common law trademarks, many of which are used in connection with its recruiting, marketing, and athletic programs. 2-ER-127-128.[3] The marks relevant to this litigation concern Pepperdine's team name, school colors, and related branding.

Since its founding in 1937, Pepperdine's athletic teams have been called the "Waves," and they are the only team in collegiate or professional basketball with that name. 2-ER-128, 2-ER-132. Pepperdine's Waves name and distinctive school colors—blue, orange, and white—are inextricably linked to the university's spirit, tradition, and brand. 2-ER-128-130. Pepperdine has also prominently incorporated the number 37, representing the year of its founding, into athletic promotional materials. 2-ER-121; 2-ER-128-129.

---

[3] Pepperdine's registered marks include the word mark WAVES (U.S. Reg. No. 2,668,597), a wave-design mark incorporating the word WAVES (U.S. Reg. No. 2,903,783), and the word mark PEPPERDINE WAVES (U.S. Reg. No. 2,967,811). 2-ER-132-137. The registrations are incontestable under Section 15 of the Lanham Act. *Id.*; 15 U.S.C. § 1065.




Pepperdine's Mark







Pepperdine has expended significant resources on marketing, advertising, and branding to build its identity around these marks, and the marks identify Pepperdine. Through registration and enforcement of its trademarks, Pepperdine is careful to ensure that its trademarks are used in ways that align with its mission and values. 2-ER-132. As a result,

Pepperdine's trademarks have long been associated with the University's unique identity and have acquired goodwill among consumers. *Id.*

**2. Defendants' infringement**

On February 27, 2025, Netflix, Warner Bros., and Kaling International released *Running Point*, a television series about a basketball franchise identified as the Los Angeles Waves and a character named Isla Gordon, who is unexpectedly appointed to be its president. 2-ER-88, 2-ER-121, 2-ER-137. Purportedly based on Jeanie Buss, a former owner of the Los Angeles Lakers and a producer of *Running Point*, the show makes no mention of the Lakers and does not use any Lakers colors or branding. 2-ER-138. Instead, the entire plot revolves around the Waves basketball team and Gordon's efforts to manage it. 2-ER-137. The show's principal characters are almost exclusively members of the Waves organization—from Gordon and her siblings (each of whom works for the Waves) to team staff, coaches, and players. 2-ER-151-152. Likewise, an overwhelming majority of scenes in the show take place at either the Waves offices, Waves practice facilities, or Waves arena, all of which are flooded with Waves logos. Indeed, the word "Waves" and the Waves marks appear in the imagery or dialogue of nearly every scene of every episode in the series. 2-ER-152-153. The team's arena appears frequently and

is prominently labeled as "the Home of the Los Angeles Waves." 2-ER-151-152.

These "Waves" logos, branding, and colors are strikingly similar to the Pepperdine Waves. 2-ER-138. The name is the same, and the colors, fonts, and typography used in the show are nearly identical to Pepperdine's marks. Plus, the context in which they arise, on athletic clothing and facilities, also matches Pepperdine's use of its own marks. *Id.* For example:

- the primary Waves logo in *Running Point* mimics Pepperdine's, featuring the word "Waves" in a similar font with orange lettering surrounded by a white outline and blue border, 2-ER-138-139;
- another Waves logo also closely resembles Pepperdine's, featuring the word "Waves" in orange lettering with an illustrated wave in the background, 2-ER-142;
- the actors in the series frequently wear jerseys and athletic gear that closely resemble Pepperdine's actual team jerseys and athletic apparel, 2-ER-138-139, 2-ER-141-142;
- like Pepperdine's, the Waves' basketball court in the series prominently features a massive WAVES mark on the wall of the training facility behind the backboard, 2-ER-140; and
- the arena where the team plays in the series is labeled "The Home of the Los Angeles Waves," 2-ER-151-152.




Defendants' Use




Pepperdine's Mark




Defendants' Use




Pepperdine's Mark




Defendants' Use




Pepperdine's Mark



Taking these confusing similarities between Defendants' use of the Waves marks and Pepperdine's use of those marks one step further, *Running Point* also features two framed jerseys that bear the number 37, the same number Pepperdine routinely highlights in its own merchandise and branding because it represents the year of Pepperdine's founding. Those number 37 jerseys are among only a handful of Waves jerseys or memorabilia prominently displayed in the series. 2-ER-143. These "coincidences" are many and consistent.




Defendants' Use Pepperdine's Mark

Defendants' use of Pepperdine's marks did not end with the show itself. Instead, the creators of *Running Point* also used Pepperdine's trademarks to market and identify the show to the public. In advance of the show's release, Los Angeles was filled with billboards advertising the show by reference to the "Waves basketball team." 2-ER-146. And novelty printed tickets for the

premiere of *Running Point* prominently featured the Waves trademark directly next to Netflix's trademark. 2-ER-158-159.







Almost to ensure that the public understood that "Waves" was being used as a source identifier, Kaling International's Instagram page described itself as the "Home of the Los Angeles WAVES." 2-ER-158. As shown below, the profile image for that page featured a picture of Mindy Kaling, Defendant Kaling International's founder, wearing a sweatshirt with a Waves logo that is indistinguishable from Pepperdine's, and holding up another photo of herself wearing the exact same sweatshirt. 2-ER-148. This is in real life, not fiction

or the show. The "home" of a product is no different than its source. (Until now, Pepperdine has been the "home" of the Waves for almost a century.)




*Running Point*'s creators also developed an Instagram page for the show (which was shuttered after Pepperdine filed its complaint in this case). That page reposted content highlighting consumers' "Need" for "Los Angeles Waves" merchandise. 2-ER-147.

Actors from the show also used the Waves trademarks to promote *Running Point*. 2-ER-149, 2-ER-153-157. Cast members, including lead cast member Kate Hudson, frequently portrayed themselves in real life wearing Waves jerseys and other athletic attire bearing the Waves wordmarks, logos, and other insignia and joked that they "joined the Waves" and "SIGNED to the Los Angeles Waves!" *Id.* These social-media posts also showed *Running*

*Point* production items that are often known to portray a show's name or logo, branded with the Waves marks. *Id.* (showing Pepperdine's marks on *Running Point* director's chairs and cups).

Defendants' use of "Waves" as a trademark (to identify source) has worked. Their actions had a meaningful effect on consumers, as the marketplace came to associate the Waves marks with *Running Point*. For instance, when consumers searched "Los Angeles Waves Basketball" on popular search engines after the show's release, the top result would relate to *Running Point* instead of Pepperdine. 2-ER-145. Following the show's debut, third parties began selling knock-off *Running Point* merchandise bearing the Waves marks, demonstrating that third parties were now associating those marks with the television show, and underscoring the extent to which consumers understood the marks to identify *Running Point*. 2-ER-159-164.




Third-Party Infringing Use




Pepperdine's Mark

### C. Procedural Background

After learning of *Running Point*'s pervasive use of its trademarks, Pepperdine contacted Netflix and Warner Bros. to try to resolve the matter. 2-ER-170. Having been rebuffed, and with the show about to be released, Pepperdine sued Netflix and Warner Bros. in federal court on February 20, 2025, alleging, among other claims, trademark infringement and dilution under the Lanham Act.[4] 4-ER-630-741. Pepperdine also moved for a temporary restraining order that same day to prevent Defendants from airing or promoting *Running Point*, which was scheduled for release a week later. 4-ER-506-628.

#### 1. Pepperdine's motion for a temporary restraining order

To support its motion for emergency relief, Pepperdine argued that it was likely to succeed on the merits because Defendants' use of its marks was "likely to cause confusion as to the source, sponsorship, or affiliation" of *Running Point*. 4-ER-526-531; *see* 15 U.S.C. § 1114. Pepperdine also argued that a temporary restraining order was necessary because *Running Point*'s

[4] Pepperdine also brought claims for false designation of origin, false advertising, unfair competition, and deceptive business practices. 1-ER-5-6. The district court found that "*Rogers* bars all of Plaintiff's claims." 1-ER-16. Accordingly, if this Court holds that *Rogers* does not apply in this case, Pepperdine can proceed on each of its claims in district court.

release would undermine Pepperdine's ability to control its brand and erode distinctive marks that Pepperdine had spent years cultivating. 4-ER-515-537.

Defendants opposed the motion. Instead of taking on Pepperdine's allegations under the traditional likelihood-of-confusion test, Defendants advanced an affirmative defense under *Rogers*.[5] 3-ER-289-293. According to Defendants, Pepperdine's claims were barred because "the series' title cards confirm that Ms. Kaling, Warner, and Netflix produced the series," meaning that "[n]o 'reasonably prudent purchasers exercising ordinary care' are going to think Pepperdine is the source of *Running Point*." 3-ER-297.

On February 26, 2025, one day before *Running Point* was scheduled to premiere, the district court denied Pepperdine's motion. 3-ER-235-242. The court held that *Rogers* applied to Pepperdine's claims, accepting Defendants' misguided argument that their use of the marks was not "source-identifying" because they had clearly identified Netflix, Warner Bros., and Kaling International as the show's producers and the show was set to air on Netflix.

---

[5] Defendants maintained that it was Pepperdine's burden at the time to establish *Rogers* did not apply. That was and remains wrong. *Rogers* constitutes an affirmative defense that defendants must raise in the first instance. *See Punchbowl*, 90 F.4th at 1028 ("[T]he defendant must first 'make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment.'") (quoting *Gordon* v. *Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir. 2018)).

*Id.* The court then applied *Rogers* and concluded that Defendants' use of the marks did not "explicitly mislead consumers as to the source of the work," relying once again on the fact that Netflix, Warner Bros., and Kaling were identified in the show's title cards. 3-ER-241-242.

### 2. Defendants' motion to dismiss

After *Running Point* was released, Pepperdine amended its complaint, adding Kaling International as a defendant and including additional allegations about Defendants' use of its marks within the show and in promotional materials. 2-ER-120-232; *see supra* pp. 14-20 (describing Defendants' use of the Waves marks on social-media posts, premiere tickets, and third-party merchandise).

Defendants moved to dismiss Pepperdine's amended complaint. 2-ER-80-118. In doing so, Defendants did not dispute the pervasive use of the Waves marks in *Running Point* or the promotional materials connected to the series. Nor did they dispute that third parties were creating and selling Waves-branded merchandise based on the series. But they nonetheless repeated their inapposite argument that dismissal was appropriate under *Rogers* because a consumer would not believe that Pepperdine produced the show. 2-ER-31, 2-ER-34, 2-ER-97.

Pepperdine opposed Defendants' motion, explaining that whether consumers believe Pepperdine produced the show is irrelevant to the threshold question of whether the *Rogers* test applies. 2-ER-52-53, 2-ER-61-63. In particular, Pepperdine argued that *Rogers* does not apply where, as here, a defendant uses a plaintiff's mark "at least in part" as a trademark—that is, to identify the source of a work. 2-ER-53-54, 2-ER-61-71; *see also Punchbowl*, 90 F.4th at 1031. In the alternative, Pepperdine argued that even if *Rogers* applied, its claims should still proceed to discovery because the complaint alleged that Defendants' use of the Waves marks was explicitly misleading as to both the source and the content of *Running Point*. 2-ER-71-72; *see Gordon* v. *Drape Creative, Inc.*, 909 F.3d 257, 267-271 (9th Cir. 2018) (explaining that *Rogers'* second prong is satisfied where the use is explicitly misleading as to the source or content of the work).

The district court granted Defendants' motion and, in doing so, failed to appropriately credit the amended complaint's new allegations. 1-ER-5-17. Instead, the court repeated its mistaken view of the *Jack Daniel's* test for the applicability of *Rogers*, reasoning that Defendants' use of Pepperdine's marks would identify the source of *Running Point* only if it "explicitly or otherwise[] suggest[ed]" that the show was "produced by Pepperdine," 1-ER-13; *see* 1-

ER-14 (applying *Rogers* because "Defendants clearly claim to be the source of the series."). And based on that producer-focused test, the district court discounted allegations showing that, as a result of Defendants' infringement, Pepperdine's marks were used extensively in the show and its promotional materials such that they were "essentially synonymous" with and "immediately recognized" as identifying *Running Point*. *See* 1-ER-14-15.

The court then applied the *Rogers* test and held that Pepperdine's complaint did not plausibly allege that Defendants had "explicitly misled consumers." But rather than ask whether *Running Point* was misleading as to the source *or* content of the show, the district court collapsed the two inquiries into one, asking only whether Pepperdine alleged that Defendants' use would "explicitly mislead[] consumers as to the *source **of** the content* of the work." 1-ER-10 (emphasis added); 1-ER-15. And to answer that question, the court simply repeated its conclusion that Pepperdine had not stated a claim because Defendants had "explicitly claim[ed] to be the source of the series." 1-ER-16.

After the district court entered final judgment, 1-ER-3, Pepperdine timely appealed, 4-ER-743-746.

## SUMMARY OF THE ARGUMENT

This appeal presents the question whether the judge-made *Rogers* test shields defendants who appropriate another's trademark to identify and promote their own television show. It does not.

I. First, the district court should not have applied the *Rogers* test at all because Defendants used the Waves marks to identify and distinguish *Running Point*.

A. Under *Jack Daniel's*, *Rogers* has no proper role when a defendant uses another's mark, at least in part, to identify and distinguish the defendant's own goods or services. Pepperdine plausibly alleged exactly that. Defendants made the Waves branding a central, recurring identifier of *Running Point* and used the same branding outside the series in advertising, social media, premiere materials, apparel, and other promotions to identify and distinguish the show to the public. Those uses, which in the district court's view rendered the Waves name "essentially synonymous with the show's identity and its source," had their intended effect: third-party sellers began marketing Waves-branded goods as *Running Point* merchandise, often relying on the Waves marks alone to identify the series. Pepperdine also alleged that Defendants themselves have registered and enforced trademarks

based on fictional businesses and sports teams featured in other television shows, confirming that Defendants understand that elements within a fictional work can acquire an independent source-identifying function necessary to obtain trademark registration.

Post-*Jack Daniel's* precedent confirms that *Rogers* does not apply in these circumstances. Courts have refused to apply *Rogers* where defendants used marks to promote fictional works, used them on merchandise or promotional materials, or selected them to suggest an association with an existing brand and exploit its goodwill. By contrast, cases applying *Rogers* involve non-trademark uses, such as uses that comment on a plaintiff's mark, that are only incidental or fleeting, or that merely convey factual information about a work's subject matter. Defendants' pervasive use of Pepperdine's marks inside and outside *Running Point* is source-identifying and therefore the regular trademark laws apply.

B. The district court declined to assess Pepperdine's allegations under the ordinary likelihood-of-confusion test. Instead, the district court applied *Rogers*' heightened test because Defendants identified Netflix, Warner Bros., and Kaling International as the show's producers, which (according to the district court) meant that consumers would not believe that

Pepperdine produced *Running Point*.

That decision rested on multiple independent errors. First, the threshold inquiry under *Jack Daniel's* is whether Defendants used Pepperdine's marks as marks—that is, to identify and distinguish their own product—not whether consumers would mistake Pepperdine for the show's producer. And as the Supreme Court has considered and made clear, because a work may bear multiple source identifiers at the same time, the correct identification of a product's manufacturer or producer is not dispositive. *Jack Daniel's*, 599 U.S. at 150, 159-160. Second, the district court's approach turns the *Rogers* test on its head. Under *Jack Daniel's*, a court must resolve whether a trademark was used to identify source *before* it considers whether a use is explicitly misleading. The district court skipped the threshold inquiry, and instead grounded its decision in whether consumers would be misled about *Running Point's* producers. And third, the court's producer-focused test will have far-reaching and dangerous results, effectively exempting movies and television shows from ordinary trademark law so long as their producers are correctly identified, even when they use another's mark to identify and promote the work. Neither *Jack Daniel's* nor this Court's precedent supports that result.

II. Even applying *Rogers*, however, Pepperdine plausibly alleged that Defendants' use of its marks explicitly misled consumers.

A. To determine whether a use was explicitly misleading as to source or content, courts consider the challenged use in context and ask whether defendants used the mark in the same way as the trademark owner; a plaintiff is not required to plead that the defendant made an affirmative statement of sponsorship or endorsement. That test was satisfied here. Defendants did not merely refer to Pepperdine or use the word "Waves" incidentally. They selected the identical "Waves" name for a Los Angeles basketball team, paired it with Pepperdine's distinctive blue-orange-white color palette, similar logos and typography, and the number 37, and then used that combination as the central identity of both the series and its public-facing promotional campaign. Together with the marketplace's treatment of the Waves marks as identifying *Running Point*, those allegations establish an explicit association between the show and Pepperdine.

B. The district court's application of *Rogers* misstated the law and failed to credit the well-pleaded allegations in Pepperdine's complaint. As to the legal standard, the district court erred twice over: first, the court never engaged with *Rogers'* content prong at all; and second, the court misconstrued

*Rogers'* source prong by holding that Defendants could not mislead consumers so long as they correctly listed *Running Point's* producers—a cramped test that finds no support in the case law. As to the district court's review of the complaint, it repeatedly misconstrued Pepperdine's allegations and resolved factual disputes in Defendants' favor. Each of these errors provides independent grounds to reverse the decision below.

III. If it concludes that *Rogers* does not apply, this Court need not reach whether Pepperdine also satisfies that test. If *Rogers* does apply, Pepperdine's allegations satisfy that test and the dismissal still must be reversed. Either way, this Court should remand for the district court to apply the traditional likelihood-of-confusion factors under the Lanham Act. But if this Court determines that the district court's expansion of the *Rogers* test is somehow compelled by this Court's precedents, it should sit en banc to revisit its precedent applying that test in this Circuit.

## STANDARD OF REVIEW

The Ninth Circuit reviews de novo a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6), "taking all well-pleaded factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Trader Joe's Co.*, 150 F.4th at 1048

(internal quotation marks omitted). Whether the *Rogers* test applies to Defendants' use of Pepperdine's marks is likewise reviewed de novo. *Twentieth Century Fox Television* v. *Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017).

## ARGUMENT

Pepperdine's complaint stated a clear-cut violation of the Lanham Act, alleging in exhaustive detail how Defendants used its marks to identify and distinguish their own product—*Running Point*—and how their use was likely to confuse consumers. By nonetheless dismissing the complaint, the district court committed two critical errors. First, it held that the demanding *Rogers* test applied solely because Defendants had not identified Pepperdine as a producer of *Running Point*. That narrow approach finds no support in law or logic and, if taken literally, would lead to a circular outcome where the same evidence is used both to trigger the *Rogers* test and to defeat trademark claims when that test is applied. Second, in applying the *Rogers* test, the district court failed to credit Pepperdine's well-pleaded allegations showing that Defendants explicitly misled consumers through their use of the Waves marks. Either error requires reversal of the district court's decision. And if this Court determines that *Rogers*, even after *Jack Daniel's*, can still sweep as broadly

as the district court held, this Circuit's precedents applying *Rogers* should be revisited through en banc review.

## I. *Rogers* Does Not Apply To Pepperdine's Allegations.

The Supreme Court explained only three years ago that *Rogers* does not apply "when trademarks are used as trademarks—*i.e.*, to designate source." *Jack Daniel's*, 599 U.S. at 155-156. That threshold inquiry should have stopped Defendants' motion to dismiss in its tracks, as Pepperdine's complaint alleged that Defendants used the Waves marks as trademarks to identify *Running Point* in the eyes of consumers. Indeed, the district court agreed that, as demonstrated by Defendants' "posts" and "other advertisements," the Waves name had become "essentially synonymous with the show's identity and its source," 1-ER-14-15, and was "'immediately recognized' to identify the Running Point series," 1-ER-14. This should have ended the inquiry: *Rogers* does not apply in this case, and the motion to dismiss should have been denied.

The district court nonetheless held that *Rogers* applied simply because Defendants did not identify Pepperdine as a producer of the show. That producer-focused approach misunderstands the inquiry required by *Jack Daniel's*. And if this Court affirms the decision below, it would give an entire

industry carte blanche to appropriate trademarks at will so long as they do not affirmatively misidentify any producers.

### A. Pepperdine Sufficiently Alleged That Defendants Used the Waves Marks as a Trademark to Identify and Distinguish *Running Point*.

Following *Jack Daniel's*, the threshold question of whether to apply the *Rogers* test turns on a single question: Did the defendant use the plaintiff's mark "at least in part" to "identify and distinguish" its products in the marketplace—*i.e.*, use the plaintiff's trademark as a trademark? *Jack Daniel's*, 599 U.S. at 156, 160; *Punchbowl*, 90 F.4th at 1031. The allegations in Pepperdine's complaint showed that Defendants did precisely that and, properly credited, should have resulted in the district court denying Defendants' motion to dismiss. A large and growing body of post-*Jack Daniel's* precedent confirms that *Rogers* has no role to play in a case like this one, where a mark was used in marketing and promotional materials as a trademark to identify and distinguish an expressive work in the marketplace.

1. The Lanham Act protects trademark owners from the use of their marks to "designat[e]" the "source for the infringer's own goods," so long as that use is likely to mislead, deceive, or confuse consumers. *Jack Daniel's*, 599 U.S. at 147, 153; 15 U.S.C. § 1114(1)(a); *see B&B Hardware Inc.* v. *Hargis*

*Indus., Inc.*, 575 U.S. 138, 142 (2015) (a trademark's source-identifying function is to "help distinguish a particular artisan's goods from those of others"). Despite that statutory command, however, the Second Circuit decided nearly four decades ago to effectively exempt from the trademark laws certain works that "have an 'expressive element' implicating 'First Amendment values.'" *Jack Daniel's*, 599 U.S. at 153 (discussing *Rogers*, 875 F.2d at 998-1000). According to the Second Circuit, such uses "pose[] only a slight risk of confusing consumers about either the source or content of the work"—meaning that plaintiffs should have to satisfy a more demanding standard before prevailing on a trademark claim involving an expressive work. *Id.* at 153-154 (quoting *Rogers*, 875 F.2d at 999-1000); *see Mattel*, 296 F.3d at 901-902 (adopting the *Rogers* test).

Whatever the merits of *Rogers* in other contexts, the Supreme Court recently held it "has no proper role" where a plaintiff's trademark is used at least in part by a defendant for its ordinary purpose, *i.e.*, as a trademark to designate the source of the defendant's creative work. *Jack Daniel's*, 599 U.S. at 156. As the Supreme Court recognized, trademarks can still designate the source of a product even if that product has an artistic or expressive element—for example, if a mechanic uses a "modified version of Harley Davidson's bar-

and-shield logo" to identify his repair shop, that is "quintessential trademark use" even if it is also expressive activity. *Id.* at 155 (internal quotation marks omitted) (discussing *Harley-Davidson, Inc.* v. *Grottanelli*, 164 F.3d 806 (2d Cir. 1999)); *see Punchbowl*, 90 F.4th at 1030-1031; *see also HomeVestors of Am., Inc.* v. *Warner Bros. Discovery, Inc.*, 2023 WL 6880341, at *4-5 (D. Del. Oct. 18, 2023) (explaining that, after *Jack Daniel's*, *Rogers* does not apply if the challenged use is source-identifying, even where the mark is used in the title of an expressive work). For that reason, *Rogers* applies only in limited circumstances where "a trademark is used not to designate a work's source, but *solely* to perform some other expressive function." *Jack Daniel's*, 599 U.S. at 155 (emphasis added); *id.* at 155-157 (holding that it was important to "cabin[]" *Rogers* so that it does not "take over much of the world").

Whether a mark is used as a source identifier is a question of fact. *Viacom*, 891 F.3d at 186 (citing *Self-Realization Fellowship Church* v. *Ananda Church of Self-Realization*, 59 F.3d 902, 907 (9th Cir. 1995)). Courts in this Circuit and elsewhere have repeatedly found that marks used within an expressive work can serve a source-identifying function, even in the presence of other source identifiers. *See, e.g.*, *id.* at 188-189 ("Both the Federal Circuit and the T.T.A.B. have held that a 'word mark does not lose its strength as a

trademark when the manufacturer['s mark] is identified along with the branded product.'") (alteration in original); *Jack Daniel's*, 599 U.S. at 160 (finding the Bad Spaniels logo was a source identifier despite another trademarked logo on the hangtag "with both appearing to serve the same source-identifying function"). In the context of a television show, the "focus is on the role that the element [or mark] plays within the show"; "[w]hen an element plays a more central role in a franchise, trademark protection is ordinarily granted." *Viacom*, 891 F.3d at 187.

Moreover, the mark need not identify a specific corporate owner, entity, or manufacturer to be a source identifier. For example, a consumer need not be able to identify Procter & Gamble Co. from use of the VICKS trademark, or to identify Mondelez International from the use of OREO. It is enough that the mark identifies and distinguishes the product in the marketplace such that a consumer can identify those products as coming from the same source. *See* 15 U.S.C. § 1127; *P&P Imports LLC* v. *Johnson Enters., LLC*, 46 F.4th 953, 960-961 (9th Cir. 2022) (rejecting the district court's requirement that consumers "be able to name P&P as the source" and explaining that such an interpretation of the relevant precedents "conflicts with our long-established

precedents requiring association with only a single—even anonymous—source").

Following *Jack Daniel's*, this Court has repeatedly held that *Rogers* does not apply when a defendant uses a trademark, at least in part, to "identify and distinguish" its own product in the marketplace, regardless of whether the defendant also used the mark in an expressive way. *Punchbowl*, 90 F.4th at 1031; *see*, *e.g.*, *Yuga Labs*, 144 F.4th at 1166 (*Rogers* inapplicable where defendants used plaintiff's marks "as source identification" for their nonfungible tokens); *Davis* v. *Blue Tongue Films*, 2024 WL 5182630, at *2 (9th Cir. Dec. 20, 2024) (*Rogers* inapplicable where film's title was used as a source identifier). And in applying that test, this Court has recognized that there are many different ways a trademark can be used to identify the source of a creative work, including when it "suggest[s] an association" between the defendant's work and the mark, "display[s] the mark in [a] similar way[]," or "exploit[s] the goodwill [and] public recognition" of the mark in promotional materials. *Davis*, 2024 WL 5182630, at *2.

2. Pepperdine's complaint includes overwhelming allegations demonstrating that Defendants used its marks as a trademark to "identify and distinguish" *Running Point*.

*First*, the complaint alleged that Defendants showcased the Waves marks prominently throughout *Running Point*. Every single episode of *Running Point* concerns the Waves basketball franchise, with nearly every scene featuring Waves wordmarks, logos, colors, jerseys, athletic facilities, and other team insignia. 2-ER-153; *see also* 2-ER-137-145. By building their fictional series around the Waves marks, and by plastering the Waves marks pervasively throughout the show, Defendants used those marks to establish a brand in the eyes of consumers and to signal to viewers which show they were watching. *See Viacom*, 891 F.3d at 188 (finding that The Krusty Krab's "central role" in the SpongeBob franchise was "strong evidence that it is recognized in itself as an indication of origin"). Indeed, the district court recognized as much, finding that Defendants' use of the Waves marks was "so pervasive as to be 'essentially synonymous with the show's identity.'" 1-ER-14-15.[6]

[6] After *Jack Daniel's*, the threshold inquiry to determine whether *Rogers* applies mirrors the source-identification requirement for an entity to claim common law trademark protection as against a third party. *Compare Jack Daniel's*, 599 U.S. at 146-147 (explaining that "a trademark is not a trademark unless it identifies a product's source" and that an owner of an unregistered mark may enforce it against infringers), *with id.* at 153-160 (finding *Rogers* does not apply when a trademark is used at least in part to identify source).

*Second*, the complaint alleged that Defendants also used the Waves marks as their own brand outside the show to promote *Running Point* to the public. *E.g.*, 2-ER-122-123, 2-ER-126-127, 2-ER-140-141, 2-ER-146-149, 2-ER-153-159, 2-ER-171-172. As described above, Defendants ran advertisements on billboards referencing the "Waves basketball team," included the Waves marks on premiere tickets alongside the Netflix and Running Point logos, and publicly proclaimed to consumers that they were the "Home of the Los Angeles WAVES." *Supra* pp. 14-20. Prominent creators, writers, and actors publicly wore Waves merchandise with logos indistinguishable from Pepperdine's, and cast members posted photographs wearing Waves jerseys to promote the show. 2-ER-153-156. In some of these uses, the title *Running Point* does not appear at all; instead, consistent with the district court's own assessment, the Waves mark itself was understood to identify the show. *See, e.g.*, *supra* pp. 14-20. In others, the *Running Point* title and the Waves marks are used side by side to create an unmistakable affiliation—precisely the way consumers would expect when there is a collaboration deal in place. *See, e.g.*, *supra* p. 18.

These are paradigmatic ways to identify source and affiliation. For example, the Waves marks were placed alongside Netflix's logo on premiere

tickets—a format typically used to identify sponsors and affiliates that is common in co-branding arrangements. 2-ER-158-159. And by publicly identifying themselves as "the Home of the Los Angeles WAVES," Defendants were claiming an association with the Waves brand, not merely describing *Running Point*'s fictional content. 2-ER-158; *see* 1-ER-16 (observing that Defendants "explicitly claim[ed] to be the source of the series"). The "home" of a brand is one way of identifying its source.

*Third*, Pepperdine alleged that, as a result of Defendants' infringement, consumers actually came to understand that the Waves marks identified *Running Point*. After the show's debut, third parties began selling knock-off Waves-branded merchandise, including t-shirts and jerseys, described as *Running Point* merchandise. 2-ER-159-164. Those products included shirts marketed as "Running Point Property of Los Angeles Waves 1952 T-shirt" and "exclusive Los Angeles Waves Replica Basketball Jersey from the hit TV show." *Id.* Here, too, much of the merchandise included only the Waves marks without referencing *Running Point* explicitly, confirming that the Waves marks alone identified the series. *See id.*

*Fourth*, Pepperdine alleged that Defendants' actions with respect to other, similar products in the marketplace underscore the source-identifying

use of the Waves marks here. In particular, Defendants understand that fictional brands within expressive works, including fictional sports teams, can indeed act as source identifiers, as they themselves have sought and obtained trademark protection for fictional brands that identify the source of their other expressive works.[7] Specifically, the complaint explained that Netflix and Warner Bros. have registered and enforced trademarks for fictional businesses and sports teams, including "AFC Richmond" (a fictional soccer team in *Ted Lasso*), the "Chudley Cannons" (a fictional sports team in *Harry Potter*), "Surfer Boy Pizza" (a fictional restaurant in *Stranger Things*), and "Central Perk" (a fictional coffee shop in *Friends*). 2-ER-150-151.

Although each of these marks reflects expressive content of some kind, Defendants claim trademark protection in them on the basis that they also identify their shows in the marketplace. *See, e.g.*, *Viacom*, 891 F.3d at 186-187 (explaining that "specific elements from within a television show" may be used as source identifiers where they "create[] a separate and distinct commercial impression"). That is important because, in order for a mark to be registered,

[7] In fact, if Pepperdine did not already own and register those marks, Defendants very well may have attempted to obtain trademark protection for their use of the Waves marks to identify *Running Point* (like Viacom did in Krusty Krab or like Defendants have done for countless other marks from their expressive works) against a third party's use of similar Waves marks.

it must function as an indication of source. *See, e.g.*, TMEP § 1202 ("[I]t is a threshold requirement of registrability that the mark [function to] 'identify and distinguish' the goods and services of the applicant from those of others, as well as 'indicate the source' of those goods and services."); 15 U.S.C. § 1127 (defining a "trademark" as including any "word, name, symbol, or device, or any combination thereof" used or intended to be used "to identify and distinguish" a person's goods from those of others "and to indicate the source of the goods, even if that source is unknown"). If Defendants register their own fictional marks, thereby representing that they are indicators of source, they should not be heard to argue that their use of "Waves" for a fictional team cannot likewise indicate source.

Defendants clearly used "Waves" as an indicator of source here. Pepperdine's allegations go well beyond the sporadic or purely expressive use of its marks within a fictional work. Taken together, they demonstrate that Defendants used the Waves marks to identify and distinguish *Running Point*. Under *Jack Daniel's*, that means *Rogers* does not apply at the threshold.

3. Post-*Jack Daniel's* law confirms that result. In the years since *Jack Daniel's*, many lower courts have refused to apply *Rogers* where a defendant used a mark to promote a television series, *see Belin* v. *Starz Ent.*,

*LLC*, 2024 WL 4720795, at *4 (C.D. Cal. Sept. 20, 2024), or to deceive consumers into believing that the mark was "associated" with a fictional work, *see Mar Vista Ent.* v. *THQ Nordic AB*, 2024 WL 3468933, at *3 (C.D. Cal. July 8, 2024); *The Upper Deck Co.* v. *Pixels.com, LLC*, 2026 WL 776227, at *27-28 (S.D. Cal. Mar. 19, 2026) (holding that *Rogers* did not apply because defendants did not use the marks "solely to perform some other expressive function"). In doing so, those courts have relied on allegations or evidence similar to Pepperdine's, including that defendants (1) used the mark on merchandise, *see Diece-Lisa Indus., Inc.* v. *Disney Enters., Inc.*, 2024 WL 5413113, at *6 (C.D. Cal. May 1, 2024); (2) used the mark to promote the show on social-media and promotional materials, *see Belin*, 2024 WL 4720795, at *2-4; *Barnes* v. *Scola*, 2026 WL 2059087, at *3-4 (N.D. Cal. July 16, 2026); and (3) selected the mark to "suggest an association" between the brand and the fictional work in order to "exploit[] the goodwill [and] public recognition" of the brand, *Davis*, 2024 WL 5182630, at *2.

Pepperdine's allegations also distinguish this case from others where *Rogers* was found to apply. To start, unlike here, many cases applying *Rogers* have involved a fictional work that commented on a brand in some way. In *Mattel*, for example, this Court applied *Rogers* to Aqua's song "Barbie Girl"

because the song "poke[d] fun at Barbie and the values that Aqua contends she represents"—a purely expressive act protected by the First Amendment, and not a trademark or source-identifying use. 296 F.3d at 899, 901; *see also Louis Vuitton Malletier S.A.* v. *Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 177-179 (S.D.N.Y. 2012) (applying *Rogers* to the use of a Louis Vuitton bag within a film as it was used for social commentary on the values represented by that actual brand). By contrast, Defendants here have never argued that they used the Waves marks to comment on or parody Pepperdine or its brand.

In other cases, courts have applied *Rogers* after concluding that an incidental or fleeting use of plaintiff's mark fell short of using it as a trademark to identify and distinguish the expressive work in the marketplace. In *Hara* v. *Netflix, Inc.*, for example, the alleged use of the plaintiff's likeness appeared in only a ten-second scene of a single episode and a similarly brief portion of the official teaser of a lengthy, ten-episode television show, and the plaintiff never alleged her likeness was source-identifying. 146 F.4th 872, 875-876, 880 (9th Cir. 2025). In *JTH Tax LLC* v. *AMC Networks Inc.*, the challenged use of "Sweet Liberty Tax Services" occurred in a single episode out of (at that time) six seasons of a popular television series. *See* 694 F. Supp. 3d 315, 332-333 (S.D.N.Y. 2023). And in *Watts* v. *Amazon Studios, LLC*, the challenged

use of the "Love Zone" mark appeared in a single scene amounting to "approximately six and a half minutes" of a single episode within a lengthy, two-season television series. 2026 WL 1678287, at *1 (S.D.N.Y. June 9, 2026). Here again, these cases did not involve the pervasive and consistent use of a mark inside and outside of the fictional work. The marks were not used as identifiers of source for the shows at issue; they were not used as trademarks.

Finally, some cases have applied *Rogers* because a plaintiff's mark was used not to identify source but solely to convey factual information, like an author's previous employer or the general subject matter of a work. *See Haas Automation, Inc.* v. *Steiner*, 750 F. Supp. 3d 1107, 1118 (C.D. Cal. 2024) (applying *Rogers* because a mark was used "merely" to "tell[] the consumer what the Book is about and who the author worked for"); *Down to Earth Organics, LLC* v. *Efron*, 2024 WL 1376532, at *4 (S.D.N.Y. Mar. 31, 2024) (explaining that a mark was used "simply to identify the subject matter and tone" of a television series); *Univ. of Ala. Bd. of Trs.* v. *New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012) (applying *Rogers* to the use of a university's uniform colors and designs "needed for a realistic portrayal of famous scenes

from Alabama football").[8] This case is very different. Defendants did not use Pepperdine's marks to convey any factual information about the university or its teams. Instead, they used those marks to brand their own show—in other words, to identify and distinguish the show, which is prototypical trademark use that should be (and, after *Jack Daniel's*, is) subject to the Lanham Act.

Some of the cases applying the *Rogers* test predate *Jack Daniel's* and do not survive scrutiny under that ruling. *See Punchbowl*, 90 F.4th at 1031 (recognizing abrogation of various earlier decisions). Post-*Jack Daniel's* case law draws a clear line between the commenting, incidental, descriptive, or otherwise purely expressive use of a mark on one hand, and the use of a mark, at least in part, to identify and promote a defendant's own work, on the other. Pepperdine's allegations fall on the latter side of that line.

### B. The District Court's Decision to Nonetheless Apply the *Rogers* Test Was Legally Erroneous.

The district court acknowledged that Pepperdine's complaint "show[ed] that the Waves mark is 'immediately recognized' to identify the *Running*

[8] Likewise, the original *Rogers* case involved Federico Fellini's film *Ginger and Fred*, which depicted two fictional Italian cabaret performers who imitated the real-world pair Fred Astaire and Ginger Rogers. *Rogers*, 875 F.2d at 996-997. This was commentary on the real-world performers, or reference to real-world events, unlike the situation here.

*Point* series"; "that its use is synonymous with the series"; that Defendants' "use of the Waves mark was so pervasive as to be 'essentially synonymous with the show's identity'"; and that Defendants "used the Waves mark in marketing the *Running Point* series." 1-ER-14-15. Under *Jack Daniel's*, those findings should have been immediately followed by the conclusion that *Rogers* does not apply.

But despite recognizing sufficient facts to preclude application of the *Rogers* test, the district court nonetheless held that none of that mattered because Defendants listed themselves, and not Pepperdine, as the show's producers. That decision is wrong on the law and entirely circular: according to the district court, the fact that Defendants accurately identified *Running Point*'s producers meant *both* that the *Rogers* test governed Pepperdine's allegations *and* that Defendants' use was not explicitly misleading under that test. And without that legal error, the district court had no basis for discounting the exhaustive evidence of trademark infringement in Pepperdine's complaint.

1. The district court began its analysis by stating (correctly) that *Rogers* would not apply if "Defendants have used the Waves mark as a designation of source for their own product—*Running Point*." 1-ER-13. But

instead of resolving that threshold issue consistent with *Jack Daniel's*, the court proceeded to focus only on whether Defendants had "explicitly or otherwise[] suggest[ed]" that *Running Point* "was produced by" Pepperdine, an inquiry that matters only if the *Rogers* test applies in the first place. *Id.* (quoting *Mattel*, 296 F.3d at 902). That holding was wrong many times over.

a. The court's singular focus on *Running Point*'s producers cannot be reconciled with *Jack Daniel's* or fundamental trademark principles relating to source identification. Following *Jack Daniel's*, the threshold question is simply whether Defendants used the Waves marks in part to identify or distinguish *Running Point* in the marketplace, and the court's own conclusions confirm they did. That finding alone should have ended the inquiry and caused the district court to deny Defendants' *Rogers*-based motion to dismiss.

Instead, the district court assumed that the only way to identify the source of a television show is to list its producers. *See* 1-ER-14. That assumption was incorrect and contrary to law. As discussed above, a single product may simultaneously bear multiple source identifiers: Nike can simultaneously be "source identified" by "Nike," the Swoosh, and the phrase "Just Do It." Television shows are no different: a single show may be

identified through a studio or series logo, a distributor name, a series title, or the pervasive use of a fictional name, all at the same time. *See, e.g.*, *NBCUniversal Media*, 653 F. Supp. 3d at 746-747; *Viacom*, 891 F.3d at 188 (concluding that the "Krusty Krab" restaurant was source-identifying for SpongeBob SquarePants). For that reason, it does not matter for the threshold inquiry that Defendants identified themselves as the producers of the show—just as it did not matter in *Jack Daniel's* that the defendant had prominently displayed both the challenged Bad Spaniels logo and the defendant's separate Silly Squeakers logo on the dog toy (and expressly disclaimed any affiliation with Jack Daniel's Distillery). *See Jack Daniel's*, 599 U.S. at 160. What matters here is that—in the district court's own words—Defendants *also* used the "Waves mark . . . to 'identify the show.'" 1-ER-14. The district court ignored longstanding law holding that accurate identification of a manufacturer is insufficient to avoid trademark infringement. *See Levi Strauss & Co.* v. *Blue Bell, Inc.*, 632 F.2d 817, 821-822 (9th Cir. 1980) (rejecting argument that jeans that included a label "prominently carr[ying] the word WRANGLER" and carried a "paper billboard identifying Wrangler as the manufacturer" was sufficient to avoid trademark liability); *Viacom*, 891 F.3d at 186-187. Other features and marks

on a product can serve as identifiers of source. Television shows are no different.

The district court's narrow focus on producers also ignores that trademark law encompasses more than just manufacturing. The Lanham Act protects against uses likely to cause confusion "as to the affiliation, connection, or association" with the trademark owner, or "as to the origin, sponsorship, or approval" of the defendant's goods. 15 U.S.C. § 1125(a)(1)(A). "Source" confusion thus includes confusion about whether the trademark owner sponsors, endorses, approves, or is affiliated with a product, not just confusion about who manufactured or produced it. And by asking only whether consumers would mistake Pepperdine for *Running Point*'s producer, the district court ignored the question at the heart of Pepperdine's allegations: whether Defendants used Pepperdine's marks to "identify and distinguish" their show, including in ways that suggest Pepperdine sponsors, endorses, approves, or is affiliated with the show. *See* 2-ER-64, 2-ER-149, 2-ER-164, 2-ER-172, 2-ER-174 (alleging Defendants used marks to "trade on the good will and reputation" of Pepperdine and to create "a false association" with Pepperdine).

b. The district court's producer-focused test also makes a hash of the Supreme Court's test. As *Jack Daniel's* explained, whether a defendant's use of a mark is source-identifying is the threshold question that determines whether to apply the likelihood-of-confusion test or the more demanding *Rogers* test. *See Punchbowl*, 90 F.4th at 1029-1030. Accordingly, once the defendant raises *Rogers*, the court must resolve whether *Rogers* applies *before* it considers whether consumers were confused or explicitly misled by the defendant.

The district court here skipped the first step. Rather than ask whether Defendants had used the Waves marks "at least in part" to "identify and distinguish" *Running Point*, *Jack Daniel's*, 599 U.S. at 156-160, the court jumped directly to the second step and analyzed only whether consumers would be explicitly misled as to which company actually produced a television show. But the threshold inquiry does not require that any consumers be "explicitly" misled. By focusing on that single issue, the district court conflated the threshold inquiry for determining whether *Rogers* applies with *Rogers*' own heightened confusion test—thereby making it impossible for any plaintiff to avoid *Rogers* without first satisfying it. The circularity of the district court's analysis is confirmed by its own conclusion that Pepperdine

could not satisfy the *Rogers* test "*for the same reasons discussed above*"—*i.e.*, for the same reasons that the court used to find *Rogers* applied in the first place. 1-ER-16 (emphasis added); *see infra* pp. 63-67 (discussing the court's application of *Rogers*).

According to the district court, its producer-focused test was consistent with this Court's case law because every post-*Jack Daniel's* decision refusing to apply *Rogers* involved the use of a trademark in the title of a creative work. 1-ER-14-15 (citing *Belin*, 2024 WL 4720795 and *Davis*, 2024 WL 5182630). But this Court has never said that the only way to identify the source of a fictional work is through its name. Indeed, courts in this Circuit and others have recognized the exact opposite—that a mark may be source-identifying even if it is *not* the name of a fictional work. *See, e.g.*, *Gordon*, 909 F.3d at 271 (jury could find use of mark explicitly misleading as to source despite being the punchline inside a greeting card); *Viacom*, 891 F.3d at 186-190 ("Krusty Krab" source-identifying despite being the name of a fictional restaurant within a children's series with a different name); *NBCUniversal Media*, 653 F. Supp. 3d at 746-747 ("Dunder Mifflin" plausibly alleged to be source-identifying despite being the name of a fictional company within a comedy series with a different name). The fact that "other source-identifiers" may be "present

alongside the [mark] does not mean that the [m]ark is not also used as a source identifier." *Belin*, 2024 WL 4720795, at *4; *supra* pp. 8-11. Here, although the show is called *Running Point* (rather than "Waves"), the complaint extensively alleges how Defendants used the mark to identify the series, not only by featuring it in nearly every scene of every episode but also by using the "Waves" logo alongside the "Netflix" and "Running Point" logos on its premiere tickets and by promoting themselves as the "home of the Los Angeles Waves," among many other things. *See* 2-ER-122-123; 2-ER-150-164.

c. The implications of the district court's approach provide a final reason to reject it. If the district court were right, a defendant could simply plaster its own mark alongside the plaintiff's mark to escape trademark liability for expressive works, as long as the credits list the correct producers. But it is widely accepted that the manufacturer of one brand cannot use the trademarks of another to promote its products, even when it identifies itself as the manufacturer of those products. For example, there is no serious dispute that BMW could not slap the Apple logo on the hood of its cars to make consumers believe that its cars were designed with Apple products in mind, then escape liability by stating that the BMW logo was also on the hood or by relying on some other indication that it was manufactured by BMW itself.

*E.g.*, *Ironhawk*, 2 F.4th at 1164 (finding that a "company's consistent use of a house mark" in conjunction with the infringing mark did not shield the company from liability and can "aggravate confusion by reinforcing the association between the mark and the junior user"). There is no reason for the result to be different simply because this case involves an intangible product like a television show. And if defendants could so easily sidestep the likelihood-of-confusion test for expressive works, then indeed "*Rogers* might take over much of the world." *Jack Daniel's*, 599 U.S. at 158.

2. The district court's producer-focused inquiry drove its entire analysis at the motion-to-dismiss stage, just as it did when the court denied Pepperdine's request for a temporary restraining order. And by hyper-focusing on that inquiry, the court was left to justify its result by expressly disregarding or discounting multiple allegations establishing that Defendants used Pepperdine's marks to "identify and distinguish" their product.

*First*, the court disregarded entirely Pepperdine's allegations that Netflix and Warner Bros. routinely trademark fictional brands central to their own shows. *See supra* pp. 40-42. According to the court, these allegations were irrelevant because they did "not show that Defendants have used the Waves mark to identify the source of *Running Point* here." 1-ER-15. But the

Supreme Court in *Jack Daniel's* treated the same exact type of evidence as probative of trademark use, observing that VIP Products' "practice as to other products in the Silly Squeakers line," including its use of parody names like "Dos Perros" and "Doggie Walker" as registered trademarks, showed it was using Bad Spaniels as a source identifier. 599 U.S. at 160. The same reasoning applies here: Defendants routinely use fictional brands as registered trademarks to identify entertainment properties, and used Pepperdine's marks the same way.

*Second*, the court faulted Pepperdine for failing to allege "that the Waves mark was used by Defendants to exploit the success of Plaintiff's sports teams or to create an association between the *Running Point* series and Pepperdine's teams." 1-ER-14. That is false. The complaint stated that Defendants "have not only infringed Pepperdine's marks, but sought to capitalize on its brand: a successful, Los Angeles basketball team named the 'Waves,' sporting the colors blue, orange, and white, alongside the number '37.'" 2-ER-144; *see also* 2-ER-149, 2-ER-164, 2-ER-172, 2-ER-174. The complaint further alleged that Defendants used the Waves marks to "trade on the good will and reputation" of Pepperdine, to create a false association with Pepperdine, and to supplant Pepperdine's own trademark significance by

causing "Waves" to become more closely associated with *Running Point* than with Pepperdine. 2-ER-149, 2-ER-164, 2-ER-172, 2-ER-174.

*Third*, the court disregarded Pepperdine's allegations concerning third-party conduct. As documented above (at p. 20), the complaint alleged that, after the show's debut, third-party sellers began offering knock-off Waves-branded shirts and jerseys described as *Running Point* merchandise, "in many instances relying on the Waves branding itself to identify the series." *See* 2-ER-149-164. This third-party marketplace conduct is powerful, objective evidence that consumers in fact perceive the Waves marks as a source-identifier for *Running Point*. But rather than grapple with this evidence, the district court simply dismissed it out of hand based on the inapposite reason that Pepperdine did "not assert any theory as to how Defendants can be liable for the acts of these third parties." 1-ER-16.

All told, the district court's singular focus on the list of *Running Point*'s producers led it to discount or ignore the core elements of Pepperdine's complaint. If instead the court had viewed Pepperdine's allegations in the most favorable light, as it was required to do, it would have concluded that Pepperdine plausibly alleged that Defendants used the Waves marks, at least in part, to identify and distinguish *Running Point*. *See Barnes*, 2026 WL

2059087, at *4 (denying motion to dismiss under *Rogers* where television producers used the challenged mark to identify a performer and "promote that artist across national television, paid streaming platforms, and social media").

## II. Even If *Rogers* Applies, Pepperdine's Allegations Satisfy It.

The district court's decision is wrong for a separate and independent reason: even if the *Rogers* test applies, Pepperdine's complaint satisfied it. Under *Rogers*, a trademark plaintiff may proceed to discovery if the allegations show that the defendant's trademark use was "explicitly misleading" "as to the source or the content of the work." *Rogers*, 875 F.2d at 999; *see Gordon*, 909 F.3d at 269. Here, Pepperdine's allegations satisfy that test, alleging that Defendants explicitly misled consumers into believing that the Waves marks were associated with *Running Point* and that Pepperdine was affiliated with the show. By dismissing Pepperdine's complaint, the district court misapplied *Rogers* in multiple ways, each of which requires reversal.

### A. Pepperdine's Allegations Satisfy the *Rogers* Test.

Pepperdine's complaint included voluminous allegations demonstrating that Defendants explicitly misled consumers through the use of the Waves marks in the *Running Point* television series. To determine whether a

defendant's use of a mark is explicitly misleading as to source, courts look for any "explicit indication, overt claim, or explicit misstatement" that falsely communicates who created, produced, endorsed, or authorized the expressive work. *Brown* v. *Elec. Arts, Inc.*, 724 F.3d 1235, 1245 (9th Cir. 2013); *see also Gordon*, 909 F.3d at 270-271. The content prong is similar, although it focuses on what the work depicts, is about, or purports to document. *See Dickinson* v. *Ryan Seacrest Enters., Inc.*, 839 F. Appx. 110, 111-112 (9th Cir. 2020).

Importantly, to satisfy *Rogers*, a plaintiff need not show that the defendant made an affirmative statement signaling the plaintiff's sponsorship or endorsement of the work. *Gordon*, 909 F.3d at 269-270 ("Such a statement may be sufficient to show that the use of a mark is explicitly misleading, but it is not a prerequisite."). Rather, courts evaluate the challenged use in context, including "the degree to which" the defendant used the mark "in the same way" as the trademark owner. *Id.* at 270; *see also Dr. Seuss Enters., L.P.* v. *ComicMix LLC*, 983 F.3d 443, 462-463 (9th Cir. 2020). Pepperdine's allegations are more than sufficient to satisfy that test.

Pepperdine alleged that Defendants selected the exact name "Waves" for a Los Angeles basketball team, even though Pepperdine is the only Los Angeles basketball team using that name. 2-ER-122, 2-ER-146, 2-ER-170.

They also used the same color palette to identify the team. 2-ER-121, 2-ER-125, 2-ER-138, 2-ER-142, 2-ER-164. Defendants even incorporated the number 37 into their depictions of the fictional "Waves" team—a number that Pepperdine uses to commemorate its founding year and which has appeared prominently on Pepperdine's athletic materials and merchandise for decades. 2-ER-121, 2-ER-123-125, 2-ER-127-130, 2-ER-143-144. And the gym and everything else associated with the team branding in *Running Point* is a virtual replica of Pepperdine Waves branding. Defendants used that branding pervasively in almost every scene of every episode of the show. 2-ER-58, 2-ER-138, 2-ER-140-141, 2-ER-153.

Defendants' use of the Waves marks outside the show was also extensive. As explained above, they promoted the series using "Waves" branding, including through cast social-media posts, promotional materials, premiere tickets, and other outward-facing uses, in a manner that would "explicitly mislead" consumers about the show's connection to Pepperdine's brand. 2-ER-146-148, 2-ER-150, 2-ER-153-159, 2-ER-164-165, 2-ER-171-172; *see also* 2-ER-122-123 (alleging that Kaling International broadly promoted itself as the "Home of the Los Angeles Waves"). And the marketplace reacted accordingly: third parties began marketing merchandise bearing the Waves

marks as *Running Point* merchandise, and searches for "Los Angeles Waves Basketball" began returning both Pepperdine and *Running Point* results. 2-ER-145, 2-ER-159-164, 2-ER-168-169.

Taken together, those allegations, at a minimum, plausibly allege that Defendants engaged in explicit conduct that misled consumers about Pepperdine's affiliation with *Running Point*. In fact, it is hard to see any other reason that Defendants would have cribbed from Pepperdine's marks so freely when developing and promoting their television show. The sheer number of similarities and the closeness of the uses make coincidence implausible: that Defendants, with their team of professional artists and writers, somehow happened to "create" a Los Angeles-based basketball team with so many similar features to Pepperdine's teams. 2-ER-128-130, 2-ER-138, 2-ER-142-143, 2-ER-164-165, 2-ER-168-170.

The allegations here are very similar to the facts of *Gordon*, where this Court applied the *Rogers* test and held that there was at least enough evidence of explicitly misleading use to reverse the district court's grant of summary judgment and send the case to a jury. *Gordon*, 909 F.3d at 271. There, a group of greeting-card companies plastered the plaintiff's "Honey Badger Don't Care" mark on their greeting cards—the same category of goods that the

plaintiff was already licensing and selling under the mark. *Gordon*, 909 F.3d at 261-263, 270-271. On that record, this Court concluded that a reasonable jury could conclude the defendant had explicitly misled consumers, noting that "the potential for explicitly misleading usage is especially strong when the [trademark owner] and the [defendants] both use the mark in similar artistic expressions." 909 F.3d at 270.

The same principle applies with more force here, particularly on a motion to dismiss. Defendants did not merely incorporate "Waves" as one expressive element among many within *Running Point*. Instead, they used the Waves mark in the same core context in which Pepperdine uses it: to identify a Los Angeles basketball team in blue, orange, and white. 2-ER-128, 2-ER-133-134, 2-ER-137-139, 2-ER-142, 2-ER-164. And they doubled down on their infringement by using those same marks in public-facing promotional materials, 2-ER-147-149, 2-ER-153-159, 2-ER-164-165, just as Pepperdine does in promoting its own basketball team. That shared context—a Los Angeles basketball team—is not diminished simply because Defendants' team is fictional. Unlike in *Twentieth Century Fox Television*, where the title "Empire" bore an independent meaning describing the show's subject matter (a fictional music empire), *see* 875 F.3d at 1198-1199, "Waves" has no

connection to the storyline or content of *Running Point* apart from its association with the fictional team, which mirrors Pepperdine's own use of the mark to identify its basketball program.

Pepperdine's allegations also go well beyond prior cases in which this Court held that *Rogers* was not satisfied, including the cases relied on by the district court and Defendants below. In one case, for example, the plaintiff's mark appeared incidentally within a video game, rather than serving as the central identity of the work. *E.S.S. Ent. 2000, Inc.* v. *Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008). In another, a video game depicted one NFL player among thousands in order to simulate professional football. *See Brown*, 724 F.3d at 1244. A third involved a common English word used for a television show about a fictional music empire, with no overt claim or explicit reference to the plaintiff's record label. *Twentieth Century Fox Television*, 875 F.3d at 1198-1199. A fourth involved a mash-up book that evoked the trademark owner's marks. *See Dr. Seuss*, 983 F.3d at 462-463. And a fifth involved an animated fictional stuntman with a "different name, appearance, and backstory" from the subject of the plaintiffs' trademarks. *K & K Promotions, Inc.* v. *Walt Disney Studios Motion Pictures*, 2022 WL 3585589, at *1-2 (9th Cir. Aug. 22, 2022).

This case is very different: Defendants did not use a different name, sport, county, or color scheme from Pepperdine's marks (unlike *K & K*); they did not place Pepperdine's branding alongside the logos of many other teams (unlike *E.S.S.* or *Brown*); and they did not reference or parody Pepperdine in a way unlikely to confuse consumers (unlike *Dr. Seuss*). Instead, Defendants copied the core identity of Pepperdine's basketball brand and made it the central organizational identity of the series—across the show itself, its promotional materials, and cast social-media posts, leading to third-party *Running Point* merchandise much like Pepperdine's own. *See supra* pp. 20-21. That is more than enough to plausibly allege a violation of the *Rogers* test. *See PLS.com, LLC* v. *Nat'l Ass'n of Realtors*, 32 F.4th 824, 831 (9th Cir. 2022) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (cleaned up).

### B. The District Court Misapplied the *Rogers* Test.

Despite Pepperdine's detailed allegations, the district court nonetheless held that Pepperdine had failed to plead infringement under the *Rogers* test. That decision rested on three separate errors. First, the district court ignored the content prong altogether, reading out an essential element of the *Rogers*

test. Second, it conflated the threshold question of whether to apply *Rogers* with the question of whether *Rogers* had been satisfied, thereby adopting a circular test that got both questions wrong. And third, the district court once again adopted a one-sided view of the complaint, resolving open factual disputes against Pepperdine, in violation of the standard applicable at the motion to dismiss stage.

1. The court's analysis began with a fundamental misreading of *Rogers*. According to the court, *Rogers* asks whether a use misleads as to the "*source of the content* of the work," instead of the "source *or* the content of the work." 1-ER-10; 1-ER-15 (citing *Punchbowl*, 90 F.4th at 1028 (9th Cir. 2024)). And based on that misformulation, the court failed to consider any of Pepperdine's allegations related to the content of *Running Point*.

That error is dispositive. Courts have repeatedly explained that source and content are two distinct prongs of the *Rogers* test. *See Rogers*, 875 F.2d at 999 (test asks whether the use "explicitly misleads as to the source or the content of the work"); *Gordon*, 909 F.3d at 269 (same); *see Dr. Seuss*, 983 F.3d at 462 (same). And there is a good reason for that: even if an expressive work does not confuse consumers as to its source, it can still harm a trademark

owner by including content that consumers improperly associate with its brand, as alleged in Pepperdine's complaint. 2-ER-164-165.

The court's misstatement of the legal standard drove its analysis. The court analyzed Pepperdine's allegations only with respect to source, asking whether Defendants' use would cause consumers to believe that Pepperdine had produced *Running Point*. 1-ER-15-16. It never separately asked what Defendants' use of Pepperdine's marks communicated about the content of the series. 1-ER-16 (describing "the question at issue" as only "whether Defendants are misleading consumers as to the source of the Running Point series"). No matter how the Court resolves the other issues presented in this appeal, it should, at a minimum, remand for the district court to consider Pepperdine's allegations of content confusion in the first instance.

2. The court also erred in its discussion of the source prong. In holding that Defendants' use was not misleading as to source, the court relied on the fact that "Defendants clearly claim to be the source of the series." 1-ER-14. But that does not answer the separate question of whether Defendants' use explicitly misled consumers into believing, despite Defendants' producer roles, that Pepperdine also was affiliated with, sponsored, or endorsed the series. *Gordon*, 909 F.3d at 269-271 (finding that

a use may be explicitly misleading even without an affirmative statement of sponsorship). The district court never considered that question in light of Pepperdine's allegations. Further, if the district court is right that a defendant not falsely listing the trademark owner as a producer of a work can both trigger the application of the *Rogers* test under *Jack Daniel's* and, at the same time, allow the defendant to avoid trademark liability under that test, the Lanham Act would be a dead letter in virtually all cases involving fictional works.

Moreover, nothing in *Rogers* or its progeny suggests that a use is not explicitly misleading—as a matter of law—any time the defendant correctly lists the producer of a work. *See Gordon*, 909 F.3d at 269-71; *Belin*, 2024 WL 4720795, at *4. Such a rule would also create perverse incentives, as defendants could escape liability simply by adding a studio logo or distributor credit alongside a knowingly appropriated mark.

3. Apart from its misstatement of the legal standard, the district court's application of *Rogers* was also driven by its failure to credit the well-pleaded allegations in Pepperdine's complaint. According to the court, Pepperdine "fail[ed] to allege that the Waves mark was used by Defendants to exploit the success of Plaintiff's sports teams or to create an association

between the Running Point series and Pepperdine's teams." 1-ER-14. Not so. The complaint expressly alleges that. Specifically, the complaint alleges that, "on information and belief, Defendants knowingly and/or intentionally named the central team in Running Point the 'Waves' so as to trade on the good will and reputation of the Asserted Trademarks." 2-ER-164. And it supported that claim with allegations showing that Defendants "knew or should have known about," and intentionally infringed, Pepperdine's marks, including facts establishing (i) Pepperdine's extensive Los Angeles and Malibu ties; (ii) Pepperdine's presence at Crypto.com Arena/Staples Center (the home arena of the Los Angeles Lakers, one of whose former owners produced *Running Point*); (iii) that creator Mindy Kaling has a home in Malibu, near Pepperdine's campus; (iv) the ease with which basic searches would have revealed Pepperdine's Waves basketball identity; and (v) the availability of Pepperdine's federal registrations through USPTO searches. 2-ER-130-132, 2-ER-168-170. Moreover, as alleged, the uses are too many and too close to be coincidental. 2-ER-125; 2-ER-137-145. The district court was not free to disregard those allegations at the motion-to-dismiss stage. *PLS.com*, 32 F.4th at 831.

* * *

The *Rogers* test ensures that, even when a trademark is used within a fictional work, a trademark owner is protected from uses that explicitly mislead consumers. Here, Pepperdine alleged that Defendants appropriated Pepperdine's distinctive identity—not only the Waves name, but also its colors, logos, typography, and other identifying features—and then used those indicia throughout *Running Point* and its promotional campaign to create the false impression that the fictional Los Angeles Waves were endorsed by or otherwise connected to Pepperdine's real-world Waves brand. Those allegations are more than sufficient to satisfy *Rogers* at the pleading stage—if *Rogers* applies in the first place.

## III. Alternatively, This Court Should Revisit *Rogers*.

The district court's decision departs from *Jack Daniel's* and should be reversed. But if the Court determines that the district court's expansion of the *Rogers* test is in any way justified by this Court's precedents, it should sit en banc to revisit *Punchbowl* and other decisions applying that test in this Circuit.[9]

---

[9] Pepperdine acknowledges that "[o]nce a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court," *Hart* v. *Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001), and therefore preserves this challenge for en

As explained above, the Supreme Court has expressly declined to endorse the *Rogers* test. *See Jack Daniel's*, 599 U.S. at 155. But the concurrence in *Jack Daniel's* explained that *Rogers* rests on a shaky foundation. *See* 599 U.S. at 165 (Gorsuch, J., concurring). The exception to the trademark laws articulated by *Rogers* does not appear in the Lanham Act, and "it is not entirely clear where [it] comes from." *Id.* No court has explained whether *Rogers* is "commanded by the First Amendment, or is . . . merely gloss on the Lanham Act, perhaps inspired by constitutional-avoidance doctrine." *Id.* And, indeed, the trademark laws pursuant to the Lanham Act already provide mechanisms to sufficiently balance First Amendment interests and the rights of trademark owners. *See, e.g.*, *Sleekcraft*, 599 F.2d at 348-49 (identifying an eight-factor test for weighing whether there is a likelihood of confusion such that trademark infringement has occurred).

In addition, this Circuit has not explained how *Rogers*' "explicitly misleading" requirement accommodates cases alleging reverse confusion, where consumers understand that the defendant produced its own works but are likely to be confused as to whether the *plaintiff's* product is derived from

---

banc review or beyond, *see* Fed. R. App. P. 40; *Lee* v. *Fisher*, 70 F.4th 1129, 1138 (9th Cir. 2023) (rehearing case en banc).

or affiliated with the defendant. *See Ironhawk*, 2 F.4th at 1159-1160, 1164; *see also* 2-ER-145, 149. *Rogers* makes little sense in that context because *Rogers* focuses on whether the defendant explicitly misled consumers as to the source or content of *its own* products, not the plaintiff's. Applying *Rogers* in such a case is borderline nonsensical, and, in any event, this Circuit has provided no guidance for how to apply *Rogers* in this way. The incoherence of *Rogers* in the context of reverse confusion provides another reason for this Court to sit en banc and to abrogate that test in this Circuit.

Once again, this Court need not reach any of these issues if it holds that the district court's analysis departed from *Jack Daniel's*. But if the panel concludes that Defendants' infringement is shielded by existing precedent, that precedent should be revisited.

## CONCLUSION

For the reasons stated above, the district court's decision should be reversed.

Dated: October 2, 2026

*/s/ Andrei Iancu*

ANDREI IANCU
ROBERT A. SACKS
AMY E. PROCTOR
CALEB J. DOWNS
EMILY D. OLSEN
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telephone: (310) 712-6600

AVIV S. HALPERN
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: (650) 461-5600

DANIEL J. RICHARDSON
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington D.C. 20006
Telephone: (202) 956-7500

DANIEL M. CISLO
KATHERINE M. BOND
CISLO & THOMAS LLP
12100 Wilshire Blvd., Ste. 1700
Los Angeles, California 90025
Telephone: (310) 979-9190

*Attorneys for Appellant Pepperdine University*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number:** 26-03131.

I am the attorney or self-represented party. **This brief contains 13912 words,** including 55 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because:
[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ *Andrei Iancu* **Date** October 2, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: October 2, 2026

*/s/ Andrei Iancu*
Andrei Iancu